**FLORIDA COAST BANK OF BROWARD COUNTY, A Florida Banking Corporation, Plaintiff-Respondent,**

v.

**William C. HINES & Constance L. Hines, Husband and Wife, and Richard M. Hines, S & V Land Company, Inc., Defendants-Appellants.**

**No. WD 32798.**

Missouri Court of Appeals, Western District.

Jan. 11, 1983.

Kenneth O. McCutcheon, Jr. of Woolsey & Yarger, Versailles, for defendants-appellants.

Terrence F. Pyle of Crews, Gaw & Pyle, Tipton, for plaintiff-respondent.

Before MANFORD, P.J., and WASSERSTROM and KENNEDY, JJ.

MANFORD, Presiding Judge.

This multicount action sought, both at law and in equity, recovery of monies due upon a promissory note. The cause was tried to the court. Judgment in the sum of $131,567.37, plus the setting aside of certain conveyances, was entered. The judgment is affirmed.

Before addressing the numerous alleged errors, it is necessary to identify the parties herein and provide a brief explanation of the developments at trial of the various issues presented to the trial court. Appellants are William C. Hines, Constance L. Hines, Richard Hines, and the S & V Land Company, Inc. William C. Hines and Constance L. Hines are husband and wife and Richard Hines is their son. The S & V Land Company, Inc. is a Missouri Corporation in which William C. Hines and Constance L. Hines are the sole stockholders and officers. These three individuals and the S & V Land Company, Inc. were original defendants at trial and throughout this opinion, they will be referred to as defendants either individually or collectively, as warranted.

Respondent is a Florida bank. Its corporate name at the origin of the transactions at issue in this case was Pompano Beach Bank and Trust Company. There was a subsequent merger and respondent's name was changed to Florida Coast Bank of Pompano Beach. By motion to amend the fifth amended petition, a further and final redesignation of respondent's name was entered and respondent's name was finally established as Florida Bank of Broward County. Respondent was the original plaintiff at trial and throughout this opinion, respondent will be referred to as plaintiff.

On or about January 16, 1975, the Circuit Court (17th Judicial Circuit) for Broward County, Florida, entered a final judgment in plaintiff's favor against defendants William C. Hines and Constance L. Hines in the sum of $70,137.98, consisting of $50,000.00 in unpaid principal, $16,091.78 of accrued interest, $146.20 in court costs, and $3,900.00 in attorney fees. This judgment remained unsatisfied.

On August 29, 1975, plaintiff filed this action in the Circuit Court of Morgan County. In response to the petition, motions to dismiss and to make more definite and certain were filed. The result of these motions was the filing of plaintiff's fifth amended petition. At this stage of the proceedings, plaintiff's claims were finally brought into focus. Within that amended pleading, four counts were set forth. Count I sought registration of the foreign (Florida) judgment; Count II for recovery of the principal and accrued interest, costs, and attorney fees under the terms of the note; Count III was in equity and sought to set aside a conveyance as fraudulent as to plaintiff in its capacity as a creditor. The final Count IV was also in equity and sought to set aside a conveyance as fraudulent as to plaintiff in its capacity as a creditor in additional tracts of land.

There followed a barrage of motions, answers, interrogatories, objections to interrogatories and requests for admissions. Issues upon the pleadings were finally drawn with the filing of defendant's answers and counterclaim to plaintiff's fifth amended petition on May 11, 1979. Three separate answers were filed. One was by defendants Richard M. Hines (a minor) and William C. Hines as guardian of Richard Hines. The second answer was filed by defendant S & V Land Company, Inc. The third answer was filed by defendants William C. Hines and Constance L. Hines. This pleading also contained a counterclaim. On August 6, 1980, plaintiff filed a Motion for Summary Judgment on Count II (for recovery of principal, interest, costs, and attorney fees under the promissory note) with supporting affidavits. On the same date,

(August 6, 1980) plaintiff filed its Motion for Summary Judgment as to defendants' counterclaim, with supporting affidavit. Defendants filed their opposition answer (with affidavits) to plaintiff's motion for summary judgment. On December 4, 1980, the trial court entered its order and judgment granting summary judgment in favor of plaintiff and against defendants William C. Hines and Constance L. Hines on the Count II promissory note and in favor of plaintiff and against defendants William C. Hines and Constance L. Hines on defendants' counterclaim. The trial court acknowledged there remained several issues of material fact regarding the remainder of plaintiff's petition and the order and judgment of December 4, 1980 was designated as *not* final for purposes of appeal.

■ This case was called for trial on February 23, 1981, on Counts III and IV only. It must be noted that Count I was not taken up at trial. At the time of oral argument, this court asked of counsel if a final judgment for purposes of appeal was before this court due to the lack of trial action upon Count I. Count II, which was the subject of plaintiff's motion for summary judgment noted above, was the same issue raised under the Count I promissory note, the difference being that under Count I, recovery was sought by and through the registration of a foreign (Florida) judgment. Plaintiff's counsel was asked by this court if there had not been a merger of Count II into the foreign judgment, Count I. None of the parties raised this issue nor did they brief it on appeal. The question was asked because of this court's duty to ascertain proper jurisdiction throughout the entirety of any proceedings. This court is satisfied that it has a final judgment for purposes of appeal and has proper jurisdiction to make final disposition herein, because the attack on the foreign (Florida) judgment was by defendant William C. Hines on the premise that the court in Florida did not have jurisdiction over him. Action taken in Florida did not involve all of the same parties as the instant proceeding. The result is that when the plaintiff moved for summary judgment as to Count II, plaintiff abandoned Count I. Therefore, with the trial court's disposition by summary judgment as to Count II and defendants' counterclaim, plus the entry of final judgment after trial on the merits upon Counts III and IV, there is a final judgment for purposes of appeal within the jurisdiction of this court.

Having outlined the foregoing background, this court now takes up defendants' points on this appeal. In disposing of defendants' points, the pertinent factual information is related therein. Defendants charge that the trial court erred (1) in granting summary judgment on Count II and their counterclaims because there existed a genuine issue of fact, (2) in granting summary judgment on Count II and their counterclaim because the supporting affidavits were insufficient, (3) in awarding to plaintiff the sum of $71,567.37 as interest because said amount was not prescribed within the terms of the promissory note, (4) in setting aside a conveyance of land (lot 20), and (5) in setting aside a conveyance of land (lot 21).

■ Review of this matter is prescribed by Rule 73.01 and *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). Neither party requested findings of fact and conclusions of law, and where the trial court has not been asked to do so, fact issues affecting the appeal are presumed to have been found in accordance with the court's judgment. *Husky Industries, Inc. v. Craig Industries,* 618 S.W.2d 458 (Mo.App.1981).

■ Under point (1), defendants charge that the trial court erred in entering summary judgment for plaintiff on the promissory note count and the counterclaim because there existed a genuine issue of fact. The issues involved in both the summary judgment on Count II and defendants' counterclaim are the same and it is conceded by defendants that the two summary judgments can be addressed simultaneously.

Count II was an action on a promissory note in the principal sum of $50,000.00 executed by defendants William C. Hines and Constance L. Hines on October 4, 1971.

The note bore interest at the rate of eight percent (8%) per annum and became due 103 days after execution. The record shows that defendants defaulted on the note. At trial, defendants William C. Hines and Constance L. Hines admitted the execution and default of the note. The purpose of the note, according to the testimony of defendant William C. Hines, was to establish for him a line of credit. The line of credit, according to William C. Hines, was for $100,000, of which he used $50,000.00. Hines further testified that he held 100,000 shares of stock in the Florida D & M Corporation. The record shows that at the time of the origin of the note, no collateral or security was requested. However, according to defendant William C. Hines, the plaintiff demanded Hines "collateralize it." Thus, a pledge of notes on the D & M Corporation in the sum total of $50,000.00 in favor of defendants was pledged as security.

William Hines also stated that he left the country for a short while and when he returned, two persons involved with the D & M Corporation had misappropriated some $100,000.00 of his monies. The record shows D & M ultimately filed for bankruptcy and William C. Hines was listed as an unsecured creditor for $100,000.00.

As regards their first point (1), defendants claim the existence of a genuine issue of fact, which prevented the court from entering summary judgment. The claimed fact issue is plaintiff's failure to collect on notes due defendants from D & M. As stated previously, these notes were pledged as collateral for the promissory note. It is defendants' position that they had a defense to the action on the note because plaintiff negligently failed to collect on the pledged notes. Defendants claim that they made demand upon plaintiff to either collect the notes or to return them to defendants so that they could collect and meet the debt due under the note. Defendants contend that in *National Exchange Bank v. Kilpatric*, 204 Mo. 119, 102 S.W. 499 (1907) and *Amick v. Empire Trust Co.*, 317 Mo. 157, 296 S.W. 798 (1927) which provide that where stock was pledged as security and the pledgee fails to sell the stock and loss occurs, the loss is credited against the debt due on the note. *National Exchange, supra*. They further urge that where the pledgee has been directed to sell, but through negligence fails to do so, the pledgee is liable for the loss. *Amick, supra.* Both *National Exchange* and *Amick* contain elements which distinguish them from the instant case. In *National Exchange*, the note sued on was as an accommodation note and no consideration passed between the parties. In addition, stock which had been pledged was sold by the holder of the note, but proceeds were not applied to the note. *Amick* involved a collateral note which was, in turn, secured by other personal property. At the time the collateral note became due and payable, it was collectible and the signers thereto were solvent.

In the instant case, the defendants' obligation under their note to plaintiff was established at least four months before the collateral notes of D & M were due. Stated another way, defendants were in default on their note in January, 1972 and the D & M notes were not due until May, 1972. This case does not fall within the rules in *National Exchange* or *Amick, supra.*

Another feature of the instant case is illustrated by the following language on the promissory note:

> "The Bank or another holder may, at any time, in its sole discretion compromise, settle or extend the time of payment of any of demands or obligations represented by any of the securities pledged hereunder ... However, neither the Bank nor other holder hereof shall be under any liability or obligation to take any steps whatsoever to fix any liability upon or to collect or enforce payment of any obligation pledged as security hereunder whether by giving any notice, presenting, demanding payments, protesting, instituting suit or otherwise."

From the face of the note, it is clear that plaintiff had no legal obligation to enforce collection of the D & M collateral notes. Plaintiff possessed a right to collect, but

bore no duty to do so. This case is analogous to a decision from our sister state, Florida. In *Tepper v. Chase Manhattan Bank, N.A.*, 376 So.2d 35, 36 (Fla.App.1979), the Florida court had before it a dispute over monies due upon two loans. These loans were secured by approximately $60,000 worth of common stock. The value of the stock continued to decline. The holder of the note (*Chase*) never liquidated the stock and the value of the stock declined to zero. When sued by Chase on the notes, the maker (*Tepper*) defended and presented a counterclaim charging Chase with negligence for failure to exercise reasonable care under § 679.9–207, Florida Statutes.

"Section 679.9–207, Rights and duties when collateral is in secured party's possession. (1) A secured party must use reasonable care in the custody and presentation of collateral in his possession. In the case of an instrument or chattel paper, reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed."

Tepper, in his appeal, contended that the evidence was undisputed. He requested Chase to sell the stock when it started to decline and asserted that the failure of Chase to do so was a failure to exercise reasonable care. The Florida court ruled:

"First, the general law is that a pledgee's duty with regards to the care of the pledged chattel is confined solely to the physical care of the chattel and a pledgee is not liable for a decline in the value of pledged instruments. In other words, the burden is upon the pledgor to preserve the value of the security." (Citations omitted)

The Florida court went on to point out that the evidence was not undisputed over the demand by Tepper to sell the securities. The court further added:

"Finally, the March 1972 promissory note reflects that Chase within its discretion had the right but not the obligation to sell the stock."

In the instant case, the trial court had before it the result of extensive discovery of the business records, correspondence, and other documents relating to the issue of the demand for payment upon a promissory note. The evidence is clear that defendants executed the note, received $50,000 in consideration, and that the note placed no legal obligation upon plaintiff to sell or otherwise make demand of payment under the D & M notes. At the time of default by defendants, the D & M notes were not due and plaintiffs never received any payment on the note from defendants or any source. The record also establishes that throughout the bankruptcy proceedings of D & M, defendants were unsecured creditors in the sum of $100,000. Defendants received $4,460.40 and defendants in turn paid this sum to their attorneys and on another indebtedness, as a result of these bankruptcy proceedings.

Other than using reasonable care in the custody of the D & M notes, plaintiff had no other obligation toward the pledged collateral notes. Based upon evidence in the record before the trial judge at the time summary judgment was entered, there was no genuine issue of fact, which, under our rules, would prohibit entry of summary judgment. In the absence of a genuine fact issue, the trial court ruled correctly that plaintiff was entitled to summary judgment upon Count II of its petition as a matter of law.

Point (1) is ruled against defendants.

Under point (2), defendants charge that the trial court erred in granting summary judgment in favor of plaintiff upon defendants' counterclaim because the affidavits in support of plaintiff's motion were insufficient.

The alleged insufficiency is centered upon the affidavit of Peter J. Hardiman and focuses upon the issue of plaintiff's negligence in the collection of the collateral notes. Defendants attack the correspondence of plaintiff bank by charging that such correspondence was inadmissible hearsay not qualified as business records. The issue of plaintiff's negligence relative to the collateral notes has already been addressed under point (1) above. This present point is disposed of by the affidavit of one Robert

L. Kester which revealed that plaintiff was and always had been the legal holder of the note; that affiant was the president of plaintiff bank and was personally involved in the transaction which involved the execution of the promissory note. Through deposition testimony, defendants acknowledge direct personal dealings with Kester.

Defendants' attack upon the affidavit of Hardiman is in direct support of their claim of the existence of a genuine fact issue and the negligence of plaintiff relative to collection of the collateral notes. Defendants do not confront the supporting affidavits and documents covering the promissory note. Defendants' position has already been ruled in point (1) above. It is the conclusion of this court that point (2) is without merit and that the affidavits and supporting documents regarding Count II and defendants' counterclaim were within the requirements and limits prescribed by our Rule 74.04.

Point (2) is ruled against defendants.

■ Under point (3), defendants charge that the court erred in the amount of interest granted plaintiff upon the note.

Defendants claim the interest sum of $71,567.37 awarded by the court was in error and amounted to compounding of the interest. It is defendants' contention that the interest due, if any, should be only $46,456.16. The note provides the following:

> "If the bank deems itself insecure, or upon the happening of any of the following events which shall be deemed a default, anything herein to the contrary notwithstanding, the Bank or other holder may, at its option, forthwith accelerate maturity and the unpaid balance, with accrued interest, hereof shall thereupon immediately become due and payable without demand or notice and said principal sum and said accrued interest shall both bear interest at the rate of ten (10%) per centum per annum from such time until paid, viz.: (1) failure to pay any installment of principal or of interest on the due date thereof, whether at maturity or after notice of intention to prepay or otherwise; . . ."

The evidence reveals that on the due date (103 days after execution) there remained due the principal sum of $50,000.00 plus accrued interest of $1,144.44. The parties agree that the law of the state of Florida controls and governs this issue. Defendants contend that there is no applicable Florida law and, thus, the law of Missouri which prohibits compounding of interest (unless agreed to between the parties) controls. Defendants urge to this court that the above provision of the note prescribed simple interest only and thus reduces the total of accrued interest to $46,456.16. There are two reasons why this court cannot agree with defendants' position. First, the above provision of the note is definite and unambiguous as regards the applicability of the 10% rate of interest. The provision makes it clear that this interest rate is applicable to *both principal and interest.* Secondly, since it is agreed and undisputed that Florida law controls and governs, this precise issue has been ruled by the court in Florida. In the case of *Morton v. Ansin,* 129 So.2d 177, 179 (Fla.App.1961), the court was dealing with a note which contained the following provision, "While in default the whole of said indebtedness, including unpaid principal, accrued interest and other charges, shall bear interest at the rate of ten percent (10%) per annum." The court in *Morton* construed said provision to provide for compound interest. This court concludes that *Morton* controls in the instant case.

The trial court did not err when it included the award of $71,567.37 as interest upon said note. There is no merit to defendants' point (3) and it is ruled against defendants.

Under point (4), defendants charge that the trial court erred in setting aside a conveyance of land (Lot 20). Defendants' attack upon the court's ruling is premised upon the failure of the evidence to clearly and convincingly support a finding of fraudulent transfer.

The evidence reveals that defendants William C. Hines and Constance L. Hines conveyed to their son, Richard (then age 6

years) all of Lot 20, Island View Acres in June, 1965. This property was reconveyed to William Hines and Constance Hines from Richard in December, 1971. One month later, the property was reconveyed to Richard from William and Constance. On the date of this last conveyance, Richard was 12 years of age.

As regards the transfer of Lot 20 to Richard in 1965, William Hines testified that there could have been some money that changed hands, but offered no proof thereof. There was no evidence of any payment or consideration for the 1971 conveyance. The testimony of Richard revealed that he never received any money or anything of value as a result of the conveyance. Richard also testified that he considered the property that of his parents. The evidence shows that this property was used as a summer place by the defendants in the 1960's and, then, as a permanent residence since the early 1970's. The record reveals that no rental has ever been paid to Richard and that mortgage payments have been made by defendants William and Constance Hines. Taxes on the property were also paid by William and Constance. Possession did not change hands with conveyance of title.

The evidence reveals that William and Constance Hines have been in financial straits from 1970 through 1972 when Lot 20 (and Lot 21 considered infra) was conveyed and reconveyed. William Hines testified to financial difficulties during the late 1960's and early 1970's. The evidence revealed that prior to securing the $50,000.00 from plaintiff, he had lost some $100,000.00 through the misappropriation of one John Dickey. The evidence shows that Hines also suffered a financial loss as a result of embezzlement of a bank in which he was a majority stockholder and that he attempted to solve that financial problem.

The evidence reveals that taxes on Lot 20 were delinquent for the years 1969–1970 and that payment of these taxes was not made until August, 1971. The evidence further reveals that Richard Hines in 1970 had approximately $24,000.00 in the bank and was in possession of several stocks and securities. William Hines testified that his son's securities were liquidated and that William Hines and Constance Hines made use of "quite a bit of it". This amounted to $28,678.93 which, when added to his cash, would have provided nearly $52,000.00 in assets for Richard in 1970. By 1975, most of the $52,000.00 had been used by William and Constance Hines, and Richard was shown to hold some $4,000.00 in assets by that date. In 1975, a guardianship was opened for Richard, and William was named guardian. The assets of the guardianship approximated $4,000.00 in closely held securities.

The record shows that during the years 1971–1975, William Hines managed the financial affairs of his son and that money was transferred back and forth between William Hines and his son and a solely-owned corporation of William and Constance Hines.

At trial, William Hines produced a financial statement claiming a net worth of $1,023,000.00 as of February 1, 1972. Hines' personal testimony placed his worth as of 1971 at three to four million dollars. This statement (in summary) claimed:

| "Cash | $ 20,143.00 |
| Loans/Accounts Receivable | 334,000.00 |
| Notes Receivable | 295,000.00 |
| Stocks/Securities | 275,000.00 |
| Real Estate | 336,000.00" |

Keeping in mind the financial difficulties referenced above, including the use of assets of the son, Richard, the evidence shows that by 1975, the above-claimed assets were almost zero. The evidence shows, by way of tax returns, the following taxable income for defendants William Hines and Constance Hines: 1973–$5,765.40; 1974–a loss of $3,678.44, and from 1975 through 1980-no returns were filed because defendants had insufficient income to meet the requirement for filing. The evidence further reveals that none of the defendants have been employed since 1970. In 1975, William Hines executed an affidavit in the guardianship proceedings that he and his wife could not totally provide for the care of Richard.

118

William Hines was quizzed extensively about his claimed assets and to what the losses of these assets were attributed. In this regard, William Hines offered no documentary proof of loss, but, by his testimony, responded in summary, as follows:

Cash—($20,143.00) in part was money borrowed from plaintiff.

Loans/Accounts Receivable ($334,-000.00) He collected $60,000.00 and used this amount to pay off debts. He claimed that the rest was uncollectible, but had no recollection as to what they were.

Notes Receivable ($295,000.00). These included the notes of the D & M Corporation and a loan to a farming corporation. He could not recall exactly what these assets were, but testified that they were not collected or collectible.

Stocks/Securities ($275,000.00). These were allegedly closely held (non-public) stocks. He could not recall what these assets consisted of and they might have been of some companies with which he was associated. Of this total, some $50,-000.00/$70,000.00 were liquidated to pay off debts, but he could not recall what happened to the remainder of these assets.

Real Estate ($336,000.00). This consisted of farm property in North/Northeast Missouri and in El Salvador or Costa Rica. He stated that he could not recall the date the Missouri property was sold, but it was sold without gain or profit. He stated he was defrauded out of the land in either El Salvador or Costa Rica.

When the entirety of the evidence relative to the financial status (both claimed and actual) of William Hines and Constance Hines is reviewed, it is obvious that the property referred to as Lots 20 and 21 constituted a major portion of their assets.

As against the evidentiary background, it must be determined if the conveyance of Lots 20/21 to Richard Hines was achieved to defraud the creditors of William and Constance Hines.

Our courts have recognized that it is difficult to determine fraudulent conveyance by direct proof. As a result, our courts look to the circumstances surrounding the parties, their actions, their relationships and to certain so-called "badges or indices" of fraud. These include: (a) the solvency or insolvency of the transferor of property, (b) the transfer of all the debtors' property; (c) whether there is pending or a threat of pending litigation; (d) the existence or lack thereof of a close relationship between the parties to the property transfer; (e) lack of adequate consideration to support the transfer; (f) retention of possession of the property by the transferor (after the transfer) and (g) any unusual handling of the transfer by the parties.

Applying the foregoing badges or indices of fraud to the instant case, it can be said that the evidence reveals: (1) William and Constance Hines were insolvent during the transfer of December 1971/January 1972. (This insolvency is an inability to satisfy indebtedness as it accrues). (2) During the transfer, the greater portion of William and Constance Hines consisted of Lots 20/21. (3) During the transfer, there obviously existed a close relationship between William Hines, Constance Hines and their son, Richard. (4) There was a total lack of consideration to support the transfers and possession of the property was retained by William/Constance Hines after transfer.

It can be observed that the only factors missing from the list of badges or indices is pending litigation or a threat thereof and any unusual handling of the transfer by the parties.

Keeping in mind that review by this court is pursuant to the rule in *Murphy v. Carron, supra,* it cannot be said that the trial court's finding of a fraudulent conveyance of Lot 20 which would be set aside was against the weight of the evidence, that it lacked substantial evidence to support it, or that it erroneously declared or applied the law.

There is no merit to defendants' point (4) and it is ruled against defendants.

Under point (5), defendants charge that the trial court erred in setting aside the conveyance of Lot 21.

This particular conveyance occurred on July 30, 1970, when Richard Hines was 11 years of age. The property is an unimproved lot adjacent to Lot 20 (discussed above). Lot 20 was improved and the family purchased it one month prior to the conveyance to Richard. Lot 21 had been purchased along with Lot 22 by William and Constance Hines from one Nettie Hodson.

It should be pointed out that the financial situation discussed above under point (4) existed at the time Lots 21/22 were purchased. It serves no purpose to restate these facts, but it is necessary to recall the status of defendants' financial position at the time Lots 21/22 were purchased.

The purchase of Lot 21 from Hodson occurred approximately one year prior to defendants' indebtedness to plaintiff. Hodson, at the time of the sale, financed its purchase by the taking of a deed of trust from defendants. Lot 22 was also a part of this sale/purchase. At trial, William Hines stated that the conveyance of Lot 21 to Richard on July 30, 1970 was to build up Richard's estate. In January 1974, Lot 22 was in the process of sale by a realtor. The realtor determined the title to be in the name of a minor, Richard. The evidence reveals that William Hines had listed the property with the realtor, designated the realtor as his agent, and that Richard had nothing to do with "his" Lots.

While proposing to sell Lot 22, the realtor further determined that Lots 21 and 22 were subject to the same deed of trust. It was decided that a foreclosure against both Lots would occur. The realtor was asked by William and Constance Hines to purchase Lot 21 from the trustee and, in turn, sell it back to them and not Richard. At this point, Lot 21 was purchased from the trustee, but conveyance was to the S & V Land Company, Inc., a wholly-owned corporation of William and Constance Hines. When William Hines was asked about this conveyance, he offered no reason. He was asked why S & V Land Company, Inc. borrowed the money and bought Lot 21, as opposed to an outright direct purchase by him and his wife. William offered no explanation. At this point, defendants owed plaintiff the sum of $50,000.00 plus accrued interest under the note.

It is correct, as discussed, that plaintiff was not a creditor of the defendants at the time of the original conveyance to Richard (July 30, 1970) and it might be questioned as to how plaintiff can claim to have been defrauded. However, plaintiff subsequently became a creditor of the defendants and was such in 1974. There is substantial evidence that during the period of the "late 1960's" and "early 1970's", defendants had existing creditors. This was revealed by defendants' financial statement which revealed liabilities of $237,943.00.

As regards subsequent creditors, our statutes provide (§ 428.020, RSMo 1978):

> "Every conveyance ... of any estate or interest in lands ... made or contrived with the intent to hinder, delay or defraud creditors of their lawful actions, damages, forfeitures, debts or demands ... shall be from henceforth deemed and taken, as against said creditors ... prior and subsequent, to be clearly and utterly void."

The foregoing statute has been construed as applicable to creditors who arise subsequent to a fraudulent conveyance. *Watson v. Harris,* 435 S.W.2d 667 (Mo.1968). There exists a difference in the burden of proof between the claims of existing versus subsequent creditors. In the case of existing creditors, constructive fraud usually suffices, but, in the case of subsequent creditors, actual fraud must be proven. *Coleman v. Alderman,* 357 Mo. 758, 210 S.W.2d 994 (1948).

The most analogous case to the instant proceedings is *May v. Gibler,* 319 Mo. 672, 4 S.W.2d 769 (1928) wherein a father conveyed to his incompetent son property where the family resided. Our Supreme Court ruled that there was evidence of an actual intent to defraud and that such conveyance was void as to existing and subsequent creditors.

Defendants on this appeal contend that the evidence is insufficient to prove actual

120

intent to defraud and, hence, the trial court erred in setting aside the conveyance of Lot 21.

Remembering that review by this court is prescribed by the rule in *Murphy v. Carron, supra,* this court cannot agree with defendants. Defendants emphasize the conveyance to Richard of July 30, 1970, and urge this court to focus on that one detail. The involvement of this property is much wider in scope. The evidence is substantial that the July 30, 1970 conveyance to Richard lacked consideration, that possession was in William and Constance Hines, that management of the property continued in William and Constance Hines, that at the time of the 1974 foreclosure, William Hines referred to the property as his, and that conveyance (instead of being directly to William and Constance Hines) was to the S & V Land Company, Inc., a wholly owned corporation of William and Constance Hines.

This court defers to the trial court as the fact finder, keeping in mind the opportunity of the trial court to observe the demeanor of the witnesses.

It cannot be said, under *Murphy v. Carron, supra,* that the trial court's finding that defendants' conveyance of Lot 21 was to defraud their creditors and that said conveyance should be set aside, was against the weight of the evidence, that it lacked substantial evidence to support it or that it erroneously declared or applied the law.

There is no merit to defendants' point (5) and it is ruled against defendants.

For the reasons set forth herein, the judgment is in all respects affirmed.

All concur.